# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1497

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota |
| Arthur Schuyler Ross, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: August 21, 2001

Filed: February 5, 2002

_____

Before BYE, LAY, and JOHN R. GIBSON, Circuit Judges.

_____

BYE, Circuit Judge.

Arthur S. Ross, convicted of fifteen counts of wire fraud and eighteen counts of money laundering, was sentenced to a total of 121 months imprisonment and ordered to pay $2.7 million in restitution. He contends the district court[1] erred in calculating the sentence, the restitution order violates Apprendi v. New Jersey, 530 U.S. 466 (2000), and he should have a new trial. We affirm.

_____

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

# BACKGROUND

We review this case for the second time. In the first appeal, Ross challenged his convictions and the restitution order, and the government cross-appealed a sentence of 87 months imprisonment. We affirmed the convictions and restitution order, but remanded for resentencing because the district court did not adequately explain its two-level adjustment under United States Sentencing Guideline (U.S.S.G.) § 3B1.1 for Ross's role in the offense (the court did not indicate how many participants were involved in the criminal activity) or its three-level downward departure under U.S.S.G. § 5K2.0. United States v. Ross, 210 F.3d 916, 925-26, 928 (8th Cir.), cert. denied, 531 U.S. 969 (2000).

On remand, the district court found Ross was an organizer or leader of criminal activity involving five or more participants or otherwise extensive, and applied a four-level adjustment under § 3B1.1. In calculating Ross's total offense level, the district court added four levels to both the money laundering and wire fraud counts, which had been separately grouped pursuant to U.S.S.G. § 3D1.2. The district court also explained its departure under § 5K2.0 and reduced the departure from three levels to two. Ross received a new sentence of 121 months (60 months on the wire fraud counts, served concurrently with 121 months on the money laundering counts) and was again ordered to pay $2.7 million in restitution.

In this appeal, Ross raises three distinct issues. First, Ross contends the district court erred by adding four levels under § 3B1.1 to the money laundering group of counts without separately addressing his leadership role in the money laundering activity. Ross contends leadership conduct from wire fraud counts cannot be used to adjust money laundering counts when those two groups of counts are grouped separately.

Second, Ross argues the restitution order violates <u>Apprendi</u>, which was decided by the United States Supreme Court the same day we issued our mandate in the first appeal. Ross contends that if a judge (rather than a jury) calculates restitution, the amount must be limited to losses arising directly from charged conduct. In a wire fraud case, Ross contends the charged conduct is limited to the wire transactions alleged in the indictment, and claims restitution should extend only to those victims affected by the specific wire transactions submitted to the jury.

Third, Ross claims the district court erred in denying a new trial motion brought after the first appeal. Shortly before Ross was resentenced, the government disclosed for the first time certain information about one of its trial witnesses. Ross argues the government's failure to disclose the information prior to trial violated <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and the jury might have acquitted him had he been able to impeach the witness with the new information.

## DISCUSSION

## I. The § 3B1.1 Adjustment to the Money Laundering Counts

Ross argues the district court erred by adjusting the money laundering group of counts under § 3B1.1 as the result of leadership conduct from the wire fraud activity. We review the district court's application of the Sentencing Guidelines de novo. <u>United States v. Blue</u>, 255 F.3d 609, 611 (8th Cir. 2001).

## A

Pursuant to our remand, the district court determined that § 3B1.1 required a four, rather than two, level adjustment to Ross's offense level. The district court then calculated the Guideline range by maintaining separate groups for the wire fraud and

money laundering counts, as it had in the original sentence.  With the new four-level adjustment, the district court calculated the offense levels for each group as follows:

## Wire Fraud Counts

| | |
|---|---|
| Base offense level under § 2F1.1(a) | 6 |
| Adjustment for amount of loss under § 2F1.1(b)(1)(N) | 13 |
| Adjustment for more than minimal planning under § 2F1.1(b)(2) | 2 |
| Adjustment for role in the offense under § 3B1.1(a) | 4 |
| Total adjusted offense level | 25 |

## Money Laundering Counts

| | |
|---|---|
| Base offense level under § 2S1.1(a)(1)[2] | 23 |
| Adjustment for amount of loss under § 2S1.1(b)(2)(G) | 6 |
| Adjustment for role in the offense under § 3B1.1(a) | 4 |
| Total adjusted offense level | 33 |

The district court next determined the combined offense level as required by the grouping rules.  The money laundering group counted as one unit, see U.S.S.G. § 3D1.4(a), and the wire fraud group counted as one-half unit because it was eight levels less than the money laundering group, see § 3D1.4(b). With a total of 1½ units, the district court added one level to the highest offense level (33 for the money laundering counts) for a combined offense level of 34.  See Grouping Table at § 3D1.4.

---

[2]Effective November 1, 2001, § 2S1.1 was amended, and § 2S1.2 was deleted and consolidated with § 2S1.1.  We refer to the Guidelines in effect at the time of Ross's sentencing on February 15, 2001.

Ross objected. He urged the district court to consider his role in the money laundering and wire fraud activities separately. He claimed there were less participants in the money laundering scheme, and he denied a leadership role in the money laundering activity. He also argued his leadership role in the wire fraud activity could not be used to adjust the money laundering counts because the wire fraud and money laundering counts had been separately grouped. He argued the adjustment was therefore inconsistent with the grouping decision, because § 3D1.2(c) requires grouping "[w]hen one of the counts embodies conduct that is treated as a specific offense characteristic in, *or other adjustment to*, the guideline applicable to another of the counts." (Emphasis added).

Without the four-level adjustment to the money laundering guidelines, the combined offense level would have been different. The money laundering group would have counted as one unit because it would have been the highest offense level (29). See § 3D1.4(a). The wire fraud group (25) would also have counted as a full unit because it would have been only four levels less than the money laundering group. Id. With a total of 2 units, two levels would have been added to the highest offense level for a combined offense level of 31. See Grouping Table at § 3D1.4. Thus, Ross contends the district court's combined offense level of 34 was three levels higher than it should have been.

The district court rejected Ross's request to consider the leadership roles in the wire fraud and money laundering activity separately. After first expressing doubt about whether Ross's argument was foreclosed by our decision in the first appeal, the district court held Ross's role in the underlying fraud offense could be considered in applying a role enhancement to the separately-grouped money laundering counts.

Although the district court denied Ross's objection and refused to consider Ross's money laundering leadership role separately, the district court granted Ross's request for a downward departure under § 5K2.0 for essentially the same reasons

advanced by Ross in the objection. Concerned about using conduct from the wire fraud activity to adjust the money laundering counts, the district court explained that

> [t]he role enhancement is a result of the fact that courts consider the fraudulent conduct and the money laundering conduct together. *The role enhancement is primarily the result of defendant's conduct in committing fraud, yet it is used to increase defendant's money laundering offense level.* While defendant's involvement in money laundering conduct certainly renders his offense more serious, a circumstance which is reflected in the higher base offense level for money laundering, defendant's relative lack of personal profit from this scheme indicates that it is not the kind of reinvestment money laundering offense that needs to be deterred with the full effect of the role enhancement in addition to the already high offense level for money laundering. A mechanical application of the money laundering guideline with the additional role enhancement, therefore, results in a sentence higher than what is warranted in this case. For this reason alone, the Court finds that a minor downward departure is appropriate.

Statement of Reasons for Imposing Sentence, App. Add. B-8 through B-9 (emphasis added).

With a two-level downward departure under § 5K2.0, the district court arrived at a final offense level of 32, one level higher than the level 31 Ross contends should apply. A final offense level of 32 provided for a sentencing range, under Criminal History Category I, of 121 to 151 months. The district court sentenced Ross to 121 months.

**B**

We find no fault with the district court's consideration of the defendant's role in the underlying wire fraud offense to adjust the money laundering counts. In our

-6-

first opinion, we observed the related nature of the wire fraud and money laundering conduct:

> Ross' wire fraud convictions were predicated on facsimile transmissions of various documents to potential borrowers (e.g., FCAs, letters promising to fund loans, and a letter terminating a loan agreement). The money laundering convictions arose from related, but separate and distinct transactions, namely the deposit of wire fraud proceeds and subsequent acts promoting the carrying on of illegal activity.

Ross, 210 F.3d at 920.  We concluded by stating

> [w]e believe that the evidence was sufficient to support the jury's determination that the illegal proceeds of wire fraud were thereafter used to promote the carrying on of the illegal scheme as alleged in the money laundering counts of the indictment. The proceeds generated from the underlying wire fraud were, in large part, the income stream that allowed Consortium to continue to maintain the appearance of legitimacy for a number of years. Indeed, the evidence showed that virtually all of the $3.2 million in fees was reinvested into Consortium's business and expended to maintain the operation.

Id. at 928.

The Sentencing Guidelines require "[t]he determination of the defendant's role in the offense . . . to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct), i.e., all conduct included under § 1B1.3(a)(1)-(4), and not solely on the basis of elements and acts in the count of conviction."  U.S.S.G. Ch. 3 pt. B, introductory cmt.  Ross's wire fraud leadership consisted of "acts or omissions [he] committed . . . during the commission of the offense of [money laundering or] in preparation for that offense," U.S.S.G. § 1B1.3(a)(1), and was therefore relevant conduct as to the money laundering counts.  Thus, the district court did not err in adjusting the money laundering guidelines based on Ross's role in the underlying

fraud offense. See United States v. Howard, 235 F.3d 366, 371 (8th Cir. 2000) (holding that relevant conduct includes the defendant's participation in all aspects of the scheme and citing with approval United States v. Hanley, 190 F.3d 1017, 1034 (9th Cir. 1999), which held that a district court did not err in considering a defendant's role in the entire wire fraud scheme in applying a § 3B1.1 adjustment to money laundering activity).

## C

Although we find no adjustment error under § 3B1.1, we agree with Ross that using conduct from one group of counts to adjust the offense level of another group of counts without thereafter grouping all the counts together is inconsistent. See U.S.S.G. § 3D1.2(c). The guidelines require district courts to examine a defendant's role-in-the-offense under § 3B1.1 *before* grouping or separating counts under § 3D1.2. See U.S.S.G. §§ 1B1.1(c) & (d) (setting forth the chronology to be followed in calculating a final offense level and requiring adjustments to be made under Part B of Chapter 3 before applying Part D of Chapter 3). Thus, when conduct from one count (or group of counts) has already been used to trigger an adjustment to another count (or group of counts), § 3D1.2(c) requires all those counts to be grouped together.

We have several times prohibited the grouping of fraud and money laundering counts together into a single group. See United States v. Green, 225 F.3d 955, 958-59 (8th Cir. 2000) (holding that a count of 18 U.S.C. § 1956 reinvestment money laundering should not be grouped with wire fraud counts under § 3D1.2(b)); United States v. O'Kane, 155 F.3d 969, 972-74 (8th Cir. 1998) (holding that a count of 18 U.S.C. § 1957 money laundering should not be grouped with mail fraud counts under either § 3D1.2(b) or (d)); United States v. Hildebrand, 152 F.3d 756, 763 (8th Cir. 1998) (holding that "fraud and money laundering counts are not so closely related as to permit loss and value grouping under § 3D1.2(d)"). But these cases do not

completely forbid such grouping. Section 3D1.2 requires counts to be grouped together "if any one or more of the subsections provide for such grouping," U.S.S.G. § 3D1.2 cmt. n.1, and indeed § 3D1.2's subsections are plainly stated in the alternative. See O'Kane, 155 F.3d at 973. Green, O'Kane, and Hildebrand addressed two of § 3D1.2's subsections, (b) and (d). But the present case involves a different subsection, (c).

The only time we addressed the grouping of money laundering and wire fraud counts under subsection (c) was in United States v. Hetherington, 256 F.3d 788 (8th Cir.), cert. denied, 122 S. Ct. 636 (2001).[3] Hetherington affirmed § 3B1.1 adjustments that had been applied to separately-grouped wire fraud and money laundering counts, and rejected a claim that Hetherington's wire fraud and money laundering counts should have been grouped together under § 3D1.2(c). Id. at 797-98. But the textual argument addressed in Hetherington differs from the one advanced by Ross. Section 3D1.2(c) requires grouping either when a count embodies conduct treated as a "specific offense characteristic in" the guideline applicable to another count, or when a count embodies conduct treated as some "other adjustment to" the guideline applicable to another count. Hetherington addressed only the "specific offense characteristic in" component of subsection (c); Ross relies upon the "other adjustment to" component of subsection (c).

---

[3]Hetherington is our only prior decision where the grouping of money laundering and wire fraud convictions under subsection (c) was addressed as an issue on appeal. But in another case, we took no issue with grouping the defendant's fraud and money laundering convictions together under subsection (c) where the fraud activity was the basis for a two-level specific offense characteristic increase in the Guideline range applicable to the money laundering counts. See United States v. O'Hagan, 139 F.3d 641, 654 (8th Cir. 1998).

Hetherington argued his knowledge about the fraudulent source of the laundered funds was erroneously treated as a specific offense characteristic in his money laundering activity because two levels had been added to his separately-grouped money laundering counts pursuant to § 2S1.2(b)(1)(B) (calling for a two level increase if the defendant knew the funds were proceeds of unlawful activity). We held, however, that Hetherington's knowledge of the origin of the funds stemmed from his money laundering conduct, not from his fraudulent conduct. We noted that fraudulent conduct comprises the various acts constituting fraud, coupled with the requisite intent to deceive; we distinguished fraudulent conduct from a money launderer's knowledge that laundered funds represent the proceeds of the fraud. Id. at 798. In other words, a money launderer's knowledge about the source of illegal funds does not constitute a part of the fraudulent conduct, but rather a part of the money laundering conduct. Thus, when the district court added two levels to Hetherington's money laundering offense level pursuant to § 2S1.2(b)(1)(B), it did so based on money laundering activity, not fraud activity.

In contrast, here the district court added four levels to Ross's money laundering offense level based on fraudulent conduct only. The district court specifically rejected Ross's request to consider the separate leadership roles Ross had in the fraud and money laundering aspects of the scheme, and instead held it was appropriate to consider the defendant's role in the underlying wire fraud offense when applying a role enhancement to the money laundering calculations. That fact further distinguishes Hetherington, where the district court separately considered the defendant's roles in both the fraud and money laundering offenses, and made specific findings indicating Hetherington had leadership roles in *both* offenses before applying § 3B1.1 adjustments to each separate group of counts. See id. at 796-97.

In sum, we believe § 3D1.2(c) requires money laundering and fraud counts to be grouped together when a district court relies solely on fraud conduct to adjust the money laundering guidelines. Our precedent does not forbid this common sense

approach. But we emphasize the limited scope of our comments. First, we suspect in most cases it will be appropriate to group money laundering and fraud convictions separately, even when both groups have been adjusted under § 3B1.1. However, in those cases (as was the case in Hetherington), a district court must separately address the defendant's leadership roles in both the fraud and money laundering activity. Grouping money laundering and fraud counts together under § 3D1.2(c) is only appropriate when a § 3B1.1 adjustment to the money laundering counts is based solely on a defendant's leadership role in the fraud activity.

Second, the money laundering guidelines were amended effective November 1, 2001. Under the amended guidelines, the base offense level for money laundering is now tied directly to the offense level for the underlying offense. See U.S.S.G. § 2S1.1(a)(2). Thus, the concern that a money laundering offense often becomes the driving force in determining the sentencing range in a fraud case (the concern which we suspect drove the district court's § 5K2.0 departure in this case) may no longer matter.

**D**

We have concluded Ross's money laundering and fraud counts should have been grouped together after fraud conduct was used to adjust the money laundering guidelines. This does not mean Ross is entitled to relief, however, because he does not challenge the district court's *grouping* decision in this appeal. He challenges only the district court's § 3B1.1 *adjustment* decision. Ross failed to challenge the district court's grouping decision in his first appeal, so our remand was limited to the departure under § 5K2.0, and the issue whether Ross's criminal activity involved five or more participants or was otherwise extensive. When "a party could have raised an issue in a prior appeal but did not, a court later hearing the same case need not consider the matter." United States v. Kress, 58 F.3d 370, 373 (8th Cir. 1995). We will not consider the issue in later proceedings "unless a party introduces substantially

different evidence, or the prior decision is clearly erroneous and works a manifest injustice." United States v. Callaway, 972 F.2d 904, 905 (8th Cir. 1992).

Ross contends he had no reason to challenge the grouping decision in the first appeal because the § 3B1.1 adjustments to the separately-grouped counts only prejudiced him upon resentencing. We disagree with Ross's claim of prejudice at the time of resentencing. Had the money laundering and fraud counts been grouped together under § 3D1.2(c), our calculations show Ross's final offense level would have been 33, requiring a sentencing range of 135 to 168 months. That range is *higher* than the range actually used by the district court after the two-level downward departure under § 5K2.0. But the district court based the departure on its concern about using conduct from the wire fraud activity to adjust the money laundering counts — a concern not present if all the counts are grouped together. Thus, Ross should have been sentenced at the higher range. Ross cannot show manifest injustice in receiving a lower sentence than he was due; in addition, Ross benefits from the government's election not to appeal from the downward departure. Finding no error in the district court's adjustment under § 3B1.1, we affirm the 121 month sentence without remanding to recalculate the sentence with all the counts grouped together.

## II.    The Apprendi Challenge to the Restitution Order

Ross contends the order requiring him to pay $2.7 million in restitution violates Apprendi because the district court ordered restitution to victims beyond those affected by the specific wire transactions submitted to the jury to prove wire fraud. Apprendi requires that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Based on this language, Ross argues the restitution statutes must be construed as reaching only those victims affected by wire transactions alleged in the indictment and submitted to the jury.

We disagree with the government's claim that Ross cannot attack the restitution order because we affirmed it in the first appeal. Apprendi was decided after the first appeal, and announced a new (although not watershed) rule of constitutional law. See United States v. Moss, 252 F.3d 993, 997 (8th Cir. 2001), cert. denied, 122 S. Ct. 848, (2002). Since Ross relies upon Apprendi, and this appeal is a direct review of Ross's resentencing, he is not barred from attacking the restitution order. See Griffith v. Kentucky, 479 U.S. 314, 328 (1987) (holding that a new rule for conducting criminal prosecutions should be applied to all cases pending on direct review or not yet final). Because Ross raised his Apprendi challenge in the district court, we review this legal issue de novo.

This is the first time we have been asked to apply Apprendi to a restitution order. Apprendi could only apply if the amount of restitution is based on (1) a "fact" other than a prior conviction not submitted to the jury, (2) that is used to increase the "penalty" for a crime (3) beyond a prescribed statutory maximum. The first two components suggest Apprendi may apply to restitution orders. First, a district court's determination of the amount of restitution is a "fact." E.g., United States v. Bartsh, 985 F.2d 930, 932 (8th Cir. 1993). Second, restitution is a criminal "penalty." United States v. Williams, 128 F.3d 1239, 1241 (8th Cir. 1997). But see United States v. Behrman, 235 F.3d 1049, 1054 (7th Cir. 2000) (holding Apprendi inapplicable to restitution orders "because restitution for harm done is a classic civil remedy"). The more difficult question, however, is whether the third component applies to restitution, that is, whether restitution is a penalty that can be "increased . . . beyond the prescribed statutory maximum." Apprendi, 530 U.S. at 490.

The statutes authorizing restitution have no "prescribed" maximum, at least to the extent they contain no definite, set amount. The district court must order restitution "in the *full amount* of each victim's losses as determined by the court," 18 U.S.C. § 3664(f)(1)(A) (emphasis added), whatever that full amount may be. Furthermore, a victim is defined as any person "directly and proximately harmed as

a result of the commission of an offense . . . including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." Id. § 3663A(a)(2). Because the "full amount" authorized by statute will vary, there isn't really a "prescribed" maximum. See United States v. Syme, 276 F.3d 131, ___ (3rd Cir. 2002) (holding, under plain error standard of review, that Apprendi does not apply to restitution because the statute does not prescribe a maximum amount); United States v. Bearden, 274 F.3d 1031, 1042 (6th Cir. 2001) (holding that restitution in the full amount of each victim's losses does not exceed the "statutory maximum"); Behrman, 235 F.3d at 1054 (comparing § 3663A to a statute "that permits the judge to impose any term of years up to life in prison," and holding that it has no "statutory maximum").

We have, however, indicated the full amount of restitution authorized by statute has its "outer limits," which we determine by "look[ing] to the scope of the indictment," which in turn "defines the scope of the criminal scheme for restitution purposes." United States v. Ramirez, 196 F.3d 895, 900 (8th Cir. 1999) (internal citations and quotations omitted). The restitution order in this case fell within the scope of the indictment, and thus was authorized by statute. In a wire fraud case, the jury must consider the existence of the fraudulent *scheme* as part of the charged conduct. 18 U.S.C. § 1343 (prohibiting the use of interstate wires for the purpose of executing a scheme or artifice to defraud); Ross, 210 F.3d at 923 n.8 ("The essential elements of wire fraud are: (1) a scheme to defraud, (2) use of interstate wires incident to the scheme, and (3) intent to cause harm."). Thus, the fraud *scheme* was an element of the conduct charged in the indictment. "Our precedent makes clear that victim restitution may be ordered for criminal conduct that is part of a broad scheme to defraud, without regard to whether the defendant is convicted for each fraudulent act in the scheme." Id. at 924.

-14-

Here, the entirety of the $2.7 million in restitution related to the "advance fee" scheme alleged in the indictment, not some other or broader scheme. Cf. Ramirez, 196 F.3d at 900 (reversing an order which required restitution related to a scheme broader than that charged in the indictment). To the extent Ramirez and the restitution statutes set a maximum, the restitution ordered by the district court fell within the maximum.

We see no inconsistency between our holding in Ramirez and the requirements of Apprendi. Thus, even if Apprendi applies to restitution orders (an issue we need not decide in this case), it would not limit restitution in a wire fraud case only to those losses stemming directly from the wire transactions submitted to the jury.

## III.    The Motion for a New Trial

Ross argues the district court should have granted him a new trial based on the government's alleged Brady violation. We review the district court's denial of the motion for a new trial for abuse of discretion. United States v. Ryan, 153 F.3d 708, 711 (8th Cir. 1998). The issue before the district court was whether there was "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 712 (quotations omitted).

The government failed to disclose that Internal Revenue Service (IRS) Special Agent Paul Walsh, a witness who summarized the money transactions that took place in Consortium's[4] bank accounts during the course of the fraudulent scheme, had been

---

[4]Consortium, a corporation formed by Ross, purported to finance business transactions. Consortium collected advance fees from individuals and businesses seeking financing, when Consortium had neither the ability nor the intent to provide financing. For further background information, see Ross, 210 F.3d at 918-19.

suspended without pay for two weeks by the IRS for misconduct.[5]  The district court noted Walsh simply traced the flow of money into and out of Consortium's accounts, while others (including Ross himself) provided the jury with evidence about how Ross benefitted from the financial transactions.  In addition, the district court noted a former IRS agent who testified on Ross's behalf agreed, in large part, with the accuracy of Walsh's summary of the money transactions.  The district court held the jury's conclusions about Ross's guilt did not depend on Walsh's credibility, and there was no reasonable probability that the outcome of the trial would have been different had the impeachment material been disclosed prior to trial.

We find no abuse of discretion in the district court's denial of Ross's motion for a new trial under these circumstances.  The district court "watched the jury as they listened to the testimony, [and] listened to the testimony and the arguments himself, having his finger as it were on the pulse of the trial . . . [and thus] was in a better position than we to weigh the imponderables involved in a judgment of prejudice." Ryan, 153 F.3d at 711 (quoting United States v. Williams, 81 F.3d 1434, 1440 (7th Cir. 1996)).

---

[5]Walsh did not disclose this information to the prosecutor prior to trial.  The prosecutor first learned of Walsh's suspension three years after trial (when Walsh was cross-examined while testifying as a defense witness in an unrelated criminal case), and then promptly disclosed the information.

## CONCLUSION

For the reasons stated, we affirm the judgment and sentence imposed by the district court in all respects.[6]

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[6]Subsequent to oral argument, Ross brought a pro se motion to revert to pro se status. The motion is denied. A criminal defendant has no federal constitutional right to appellate self-representation. Martinez v. Court of Appeal, 528 U.S. 152, 163 (2000). We believe Ross's future interests will be better protected if he continues to be represented by counsel.