FILED
United States Court of Appeals
Tenth Circuit

July 12, 2011

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

    v.

CATHERINE SENNINGER,

      Defendant - Appellant.

No. 10-1450

---

**ORDER**

---

Before **BRISCOE,** Chief Judge, **ANDERSON**, and **MURPHY**, Circuit Judges.

This matter is before the court on Appellant's Petition for Panel Rehearing. Also before the court is a request by Appellant's counsel to withdraw and have new counsel appointed to represent Appellant. Panel rehearing is granted solely to amend footnote 1. Accordingly, the panel's opinion, *United States v. Senninger,* No. 10-1450, 2011 WL 2455662 (10th Cir. June 21, 2011), is vacated and replaced with the opinion issued herewith. Counsel's motion to withdraw is **granted**. The request for appointment of substitute counsel is **denied**.

Entered for the Court,

*Elisabeth A. Shumaker*

ELISABETH A. SHUMAKER, Clerk

FILED
United States Court of Appeals
Tenth Circuit

July 12, 2011

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

CATHERINE SENNINGER,

Defendant - Appellant.

No. 10-1450

(D. Colorado)

(D.C. No. 1:08-CR-00456-MSK-2)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE,** Chief Judge, **ANDERSON**, and **MURPHY**, Circuit Judges.

---

I.     **Introduction**

Defendant Catherine Senninger was convicted of six counts of mail fraud

and one count of making a false claim against the Government. She was

acquitted of several other counts, including conspiracy and additional mail fraud

counts. At trial, the Government presented evidence that Senninger, through her

involvement with a company known as Olympia Financial and Tax Services, Inc.

("Olympia"), participated in a scheme to defraud the Internal Revenue Service

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

("IRS") and the State of Colorado Department of Revenue ("CDR") by preparing amended tax returns containing false or fraudulent information. Based, in part, on its finding that the loss to the IRS and the CDR was $149,682.84, the district court sentenced Senninger to thirty-six months' imprisonment. The sentence represented an upward departure from the advisory guidelines range. Senninger was also ordered to pay $128,664.27 in restitution. In this appeal, Senninger challenges her sentence, including the restitution order. Exercising jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, this court **affirms**.

## II. Background

Senninger and her codefendant, Jeffrey Harris, were charged in a multi-count indictment with seventeen counts of mail fraud, one count of conspiracy to defraud the government, and five counts of presenting false claims to the government. The details of the scheme which gave rise to the charges are set out in this court's opinion disposing of Harris's appeal.

> From 2001 through 2006, [Harris] ran a scheme to defraud the Internal Revenue Service (IRS) and the Colorado Department of Revenue (CDR), whereby he sought tax refunds for customers of Olympia Financial and Tax Services (Olympia), a corporation he owned and controlled. Harris had no specialized tax-preparation experience, nor was he a certified public accountant or a former IRS agent. Olympia's employees and Harris directly solicited customers. They represented that: (1) Olympia could amend the customers' tax returns to claim legitimate tax refunds, (2) the tax professionals who worked at Olympia were former IRS employees or were otherwise qualified to amend tax returns, and (3) Olympia would use legal methods and truthful information to amend customers' returns. Harris also developed and used promotional written and internet

materials falsely representing that Olympia employed experienced tax and legal professionals to review the amended returns to ensure compliance with the law.  He also represented that all amendments to tax returns would be discussed with the customer and supported with documentation.

To implement the scheme to defraud, Harris and others prepared amended federal and state tax returns containing false information so as to entitle the customer to a refund.  Typical of the false claims were itemized deductions, business profits or losses, educational expenses, amount of taxable income, and the amount of refund owed to the taxpayer.  Olympia charged its customers 40 to 50 percent of any refund they received.  As a result of this scheme, Harris and others caused over 800 fraudulent amended returns to be filed with the IRS claiming $2,667,788 in refunds . . . .  In addition, over 500 fraudulent amended returns were filed with the CDR claiming $511,101 in refunds.

*United States v. Harris*, No. 10-1328, 2011 WL 1289156, at *1-*2 (10th Cir. April 6, 2011) (footnote omitted).  Senninger concedes trial testimony and stipulated evidence shows she prepared more than 100 amended federal and state returns for Olympia.[1]

According to Senninger, she worked for the IRS from the 1960s to 1985 and, at one point in her employment, held the position of tax auditor.  At trial, Harris testified Senninger's past employment with the IRS was one of the reasons he hired her.  Senninger provided Harris with a photocopy of her old IRS badge,

---

[1]Our review of Senninger's appeal has been significantly impeded by her nearly complete failure to provide citations to the relevant sections of the record, as required by Fed. R. App. P. 28(e).  Notwithstanding that failure, this court has thoroughly reviewed the entire appellate record and, based on that independent review, fully considered all appellate arguments raised by Senninger.

which he framed and placed on the wall in Olympia's offices. Harris distributed additional photocopies to Olympia's commissioned salespeople who used Senninger's credentials when marketing Olympia's tax preparation services to potential customers. Several taxpayers testified they were influenced in their decision to use Olympia because of Senninger's past employment with the IRS. Harris testified Senninger was aware her credentials were being used in this way.

Senninger concedes the Government presented sufficient evidence at trial to demonstrate she placed false and fraudulent information on amended tax returns, including falsified itemized deductions and falsified profits or losses from taxpayer businesses. The information was gleaned from a client questionnaire created by Harris with input from Senninger. Harris testified the questionnaires were completed either by Olympia's client or by a salesperson based on information provided by the client. Harris also testified he frequently added false information to the questionnaires or changed the information provided by the client. In some circumstances, he completed an entirely new questionnaire for the client. Harris based the false information he added to the questionnaires, including false deductions, on training he received from Senninger. The questionnaires were then forwarded to Senninger who used the information recorded on them to prepare amended state and federal tax returns for the client. Harris testified that when Senninger completed an amended return for an Olympia client, she would prepare fraudulent schedules to support the false deductions he

-4-

included on the questionnaires.  Additionally, Senninger did not necessarily use the answers on the questionnaires to prepare the returns.  For example, Senninger concedes that if the questionnaire contained round numbers, she "changed the numbers on the filed returns so that the returns no longer had whole, round numbers on some of the deduction figures."

The jury found Senninger guilty of six counts of mail fraud and aiding (and abetting) and one count of making a false claim against the government (and aiding and abetting).  She was acquitted on the remaining counts, including the conspiracy count.  A Presentence Investigation Report ("PSR") was prepared prior to sentencing.  The PSR estimated the total loss from the scheme in which Senninger participated to be $263,417 which increased her base offense level by twelve levels.  *See* USSG §§ 2B1.1(a)(1), (b)(1)(G).  Senninger's total offense level for guidelines sentencing purposes was calculated at twenty-one.  Senninger received one criminal history point for a 2009 Arizona assault conviction, resulting in her being assigned a Category I criminal history category.  Although Senninger also had 1992 federal convictions for falsification of documents and obtaining funds by fraud and false statements, those convictions were not assigned any criminal history points because they were stale.  *See* USSG § 4A1.2(e)(1), (3) (excluding from a defendant's criminal history calculation any sentence not exceeding one year and one month that was imposed more than ten years before the commencement of the instant offense).

Prior to sentencing, the Government filed a sentencing statement requesting the district court to depart upward from the advisory guidelines range by sentencing Senninger as if the stale convictions were included in her criminal history calculation. *See* USSG § 4A1.3(a) (permitting a district court to depart upward when a defendant's criminal history category does not adequately represent the seriousness of her criminal history). In response, Senninger filed a motion opposing any upward departure. She also challenged, *inter alia*, the calculation of her advisory guidelines range. Specifically, she argued the PSR incorrectly calculated the loss amount for purposes of determining her guidelines offense level. Relying on Government Exhibit 154 and a report prepared by her expert, David Romero, Senninger took the position that she was responsible for a total loss of only $6409.73. This amount represented the sum of the increases Senninger made to the figures on the questionnaires she used to prepare the amended returns listed in Exhibit 154, less any decreases she made to those figures. Senninger argued any other refunds claimed on the amended returns were amounts the taxpayers were "necessarily entitled" to receive and, thus, could not be used to calculate either actual or intended loss.

The parties stipulated that only the amended tax returns listed in Exhibit 154 should be used to calculate the loss amount. They disagreed, however, over the proper method of calculating the loss amount for both offense level and restitution purposes. Senninger again argued the loss amount was limited to the

net of the alternations she made to the information from the questionnaires when she prepared the amended returns. The Government argued Senninger participated in a scheme that resulted in a loss of $149,682.84, the total amount of all federal and state refunds claimed on the returns listed in Exhibit 154. The district court agreed with the Government, finding a loss amount of $149,682.84 and, accordingly, increasing Senninger's offense level by ten levels. *See* USSG § 2B1.1(b)(1)(F).

The district court also granted the Government's request for an upward departure pursuant to USSG § 4A1.3(a)(1) and added two points to Senninger's criminal history calculation. Consequently, the court calculated Senninger's advisory guidelines range at thirty-three to forty-one months' imprisonment based on a total offense level of nineteen and a Category II criminal history. The court rejected Senninger's request for a downward variance and sentenced her to thirty-six months' imprisonment. The district court also ordered Senninger to pay $120,558.27 in restitution to the IRS and $8106.00 to the CDR. The restitution to the CDR was less than the loss amount attributable to the fraudulent state returns because the CDR successfully collected a portion of the improperly paid refunds.

### III. Discussion

In this appeal, Senninger first argues the district court erred in calculating amount of loss. Because the amount of loss was used to determine Senninger's advisory guidelines range, this challenge is to the procedural reasonableness of

her sentence.  *See United States v. Huckins*, 529 F.3d 1312, 1317 (10th Cir. 2008).  When determining whether the district court properly calculated a defendant's advisory guidelines range, this court reviews factual findings for clear error and legal determinations de novo.  *United States v. Kristl*, 437 F.3d 1050, 1054 (10th Cir. 2006).  Senninger's challenge to the district court's calculation of loss amount for purposes of USSG § 2B1.1 involves factual findings that we review for clear error.  *See United States v. Sutton*, 520 F.3d 1259, 1262 (10th Cir. 2008).

When sentencing a defendant convicted of an offense involving fraud, the district court may use "either the actual or the intended loss to establish the defendant's offense level."  *United States v. Masek*, 588 F.3d 1283, 1287 (10th Cir. 2009).  Accordingly, the court need only make a reasonable estimate of either "the reasonably foreseeable pecuniary harm that resulted from the offense," or "the pecuniary harm that was intended to result from the offense."  USSG § 2B1.1 cmt. n.3(a)(i), (ii)(I).  Having reviewed the entire record, including Romero's report and the district court's comprehensive explanation of why it rejected the methodology advocated by Senninger, we discern no error in the district court's calculation of loss.  As the court stated, Senninger was convicted of participating in a scheme to defraud both the IRS and the CDR.  To find Senninger guilty of mail fraud, the jury was required to find she "knowingly devised or participated in a scheme to obtain money by means of false representation."  Thus, the court

looked at the totality of Senninger's involvement in that scheme, concluding her actions did not involve "simply filling in blanks on amended returns." The district court found Senninger "len[t] credibility to the entire operation. She lent her credibility as having been an IRS auditor to this operation, and she knew she was doing that when she gave the credentials to Mr. Harris." The district court's finding is amply supported by the trial testimony of several witnesses who stated they submitted amended returns through Olympia because Senninger's credentials conferred an air of legitimacy on the business. It is further supported by Harris's testimony that Senninger knew Olympia was using her credentials to market services to taxpayers, and his testimony that Senninger trained him in how to create fraudulent deductions and created false schedules to support those deductions. Accordingly, the district court did not err in finding the loss attributable to Senninger was the total amount claimed on the fraudulent amended returns filed with IRS and the CDR. We conclude the district court fulfilled its obligation to arrive at a reasonable estimate of the loss attributable to Senninger and there was no clear error in its calculation.

Senninger next challenges the district court's imposition of an upward departure pursuant to USSG § 4A1.3. An upward departure may be warranted "[i]f reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history." USSG § 4A1.3(a)(1). When considering a challenge to an upward

departure, this court applies a four-factor analysis: "(1) whether the district court relied on permissible departure factors, (2) whether those factors removed a defendant from the applicable Guidelines heartland, (3) whether the record supports the district court's factual bases for a departure, and (4) whether the degree of departure is reasonable." *United States v. Robertson*, 568 F.3d 1203, 1211 (10th Cir. 2009).  Senninger's challenge is confined to the first factor. Specifically, she asserts the district court was precluded from using her stale convictions to increase her criminal history category because the Guidelines specifically prohibit the sentence from being counted.  Far from being supported by the Guidelines, however, Senninger's argument is directly foreclosed by them.

Section 4A1.2(e)(3) of the Guidelines excludes from a defendant's criminal history calculation any sentence not exceeding one year and one month if the sentence was imposed more than ten years before the commencement of the offense of conviction.  The Application Notes to § 4A1.2, however, specifically permit stale sentences to be considered by a court "in determining whether an upward departure is warranted under § 4A1.3" if the court first finds that the stale sentence "is evidence of similar, or serious dissimilar, criminal conduct."  USSG § 4A1.2 cmt. n.8.  Here, the district court faithfully followed this approach by finding that Senninger's 1992 sentence was imposed for criminal conduct similar to the conduct involved in the instant offense.

The conviction in 1992 in the Federal District Court in the

District of Utah occurred when Ms. Senninger was 46 years old. She was not a young woman. She was employed in a capacity with an educational institution, where she was entrusted with information as to the procedure used by students to obtain financial aid from the Federal Government. She had a special skill. Using that skill, she embezzled, misapplied, or obtained by fraud and false statement federal loan money.

This offense occurred during Ms. Senninger's sixth decade, her 60's. Again she is a mature woman. It involved a special skill. It involved the use of a special skill to defraud the Federal Government by getting money ostensibly for a third party but ultimately resulting in her benefit, too. It's very similar. It's hard to imagine a more similar offense that's not identical.

Senninger does not challenge the district court's finding that the convictions are similar. Because the Guidelines themselves specifically permit the exact approach taken by the district court, we must reject Senninger's argument that the court erred by using her stale sentence as a basis for a § 4A1.3 upward departure.

Senninger's final challenge is to the amount of restitution ordered by the district court pursuant to the Mandatory Victims Restitution Act ("MVRA"). *See* 18 U.S.C. § 3663. "We review the district court's application of the MVRA *de novo*, review its factual findings for clear error, and review the amount of restitution awarded for abuse of discretion." *United States v. Gallant*, 537 F.3d 1202, 1247 (10th Cir. 2008). Senninger's argument is two-pronged. She first asserts the amount of restitution is limited to the losses stemming solely from the counts of which she was convicted and not any counts of which she was acquitted. *Cf. Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting

the restitution provision of the Victim and Witness Protection Act of 1982). She then repeats the argument that the loss attributable to her actions is limited to the net of the changes she personally made to the questionnaires.

The district court properly rejected both of Senninger's arguments. As the court recognized, by convicting Senninger of six counts of mail fraud and one count of making a false claim against the Government, the jury necessarily found she participated in the overall scheme to defraud the IRS and the CDR. Thus, the district court was not limited to considering only the refunds paid by the IRS and the CDR as a result of the conduct specifically enumerated in Counts 3-7, 10, and 19. 18 U.S.C. § 3663A(a)(2) (defining victim as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern); *United States v. Gregoire*, 638 F.3d 962, 972-73 (8th Cir. 2011) ("Restitution may be ordered for criminal conduct that is part of a broad scheme to defraud, without regard to whether the defendant is convicted for each fraudulent act in the scheme." (quotation and alteration omitted)). Accordingly, the district court did not err by ordering restitution for all actual losses suffered by the IRS and the CDR arising from the entire scheme. For the same reasons we rejected Senninger's loss-calculation challenge to her advisory guidelines range,

-12-

we also reject her second argument that she was only responsible for a fraction of the losses suffered by the IRS and the CDR because her criminal conduct was limited to making minor alterations to the refunds claimed on the amended returns.

## IV.    Conclusion

Senninger's sentence is **affirmed**.

ENTERED FOR THE COURT

Michael R. Murphy
Circuit Judge